WADSWORTH *v.* NEW YORK LIFE INSURANCE COMPANY.

1. Appeal and Error—Directed Verdict—Evidence.

   The Supreme Court examines the record on appeal from directed verdict and judgment for defendant at close of plaintiff's case to see whether there was competent evidence from which the jury could have found for plaintiff.

2. Evidence—Circumstantial Evidence—Inferences.

   A jury may draw reasonable inferences from the established facts and circumstances, in the absence of direct proofs.

3. Insurance—Life—Evidence of Acceptance of Risk.

   Evidence presented by plaintiff widow in her action against defendant insurance company *held*, sufficient to present to jury the matter of defendant's acceptance of risk, hence, a valid contract of life insurance between defendant and her late husband, a combat pilot in the United States air force.

4. Same—Application for Life Insurance—Presumptions.

   It will not be presumed that a life insurance company's agent deliberately had a prospective purchaser apply for and pay the first premium protection on life insurance which was known not to be available to the applicant.

5. Same—War and Aviation Risks—Evidence.

   The establishment of an insurance company's rules and policies pertaining to acceptance of war and aviation risks must be accomplished by competent evidence during trial.

References for Points in Headnotes

[1] 3 Am Jur, Appeal and Error §§ 853, 886.
[2] 20 Am Jur, Evidence § 270 *et seq.*
[3] 29 Am Jur, Insurance §§ 1536, 1538.
[4] 29 Am Jur, Insurance § 857 *et seq.*
[6, 7] 29 Am Jur, Insurance § 139 *et seq.*
[8] 12 Am Jur, Contracts §§ 65, 231.
[9] 29 Am Jur, Insurance § 1500.

6. SAME—APPLICATION—ACCEPTANCE—TIME.

Generally, mere silence or inaction on the part of an insurance company does not constitute assent to an application for life insurance, but where it fails to reject an application within a reasonable time, an acceptance is implied.

7. SAME—ACCEPTANCE OF APPLICATION—DELAY—QUESTION FOR JURY.

Whether or not there was an unreasonable delay on the part of defendant insurance company in the acceptance of an application for an ordinary life insurance policy from a United States air force combat pilot, made while he was home on a short leave from active duty, was a question of fact for jury under evidence presented in record in action by widow.

8. CONTRACTS—EQUIVOCAL WORDS—PAROL EVIDENCE.

Parol evidence is admissible to aid in arriving at the intention of the parties when equivocal words are used in a contract.

9. INSURANCE—EFFECTIVE DATE OF POLICY—AMBIGUITY—ORAL EVIDENCE.

Application for life insurance which defendant's agent solicited from plaintiff widow's late husband, a combat pilot in the United States air force, *held*, to contain such ambiguous language as to when the policy became effective as to have made competent oral testimony relative to circumstances surrounding the taking of the application and the expressed understanding of the parties concerning such effective date.

SHARPE and CARR, JJ., dissenting.

Appeal from Wayne; Culehan (Miles N.), J. Submitted October 11, 1956. (Docket No. 69, Calendar No. 46,807.) Decided July 31, 1957.

Action by Bernice Wadsworth against New York Life Insurance Company, a foreign corporation, for insurance policy benefits on death of husband. Directed verdict and judgment for defendant. Plaintiff appeals. Reversed and new trial granted.

*Ellmann & Ellmann,* for plaintiff.

*Armstrong, Essery, Helm & Marshall (Harold E. Stieg,* of counsel), for defendant.

Sharpe, J. (*dissenting*). Plaintiff, Bernice Wadsworth, is the widow of Joseph W. Wadsworth, a captain and senior pilot in the United States air force. Defendant is a life insurance company with principal offices in New York City with a branch office in Detroit. On or about January 4, 1951, while on military leave, and preparatory to returning to the Far East, Captain Joseph W. Wadsworth applied for a policy of life insurance through an agent of defendant company, Mr. Frank Crum of Grosse Pointe Farms. He took a physical examination and furnished all required medical information and was found to be in good health. He paid advance premiums in the amount of $68.20. The policy applied for was in the amount of $10,000. He also arranged for the deduction from his military pay the sum of $22.90 per month. On January 11, 1951, Captain Wadsworth left for military duty in the Far East. The application for insurance contained the following:

"It is mutually agreed that:

"1. If the applicant shall have paid the soliciting agent in cash, as indicated in item 25 above, an amount which equals the full first premium for the policy applied for, and if the company shall receive evidence satisfactory to it that at the time of completion of this application the proposed insured (and the applicant for the child's protection benefit, if any) was an acceptable risk for said policy at the company's published premium rate therefor, the policy as applied for shall be deemed to be in effect as from the date specified in item 18 above as if it had been delivered. Except as provided in the preceding sentence said policy shall not go into force unless and until it is delivered to the applicant and the first premium thereon paid in full during the lifetime of the proposed insured and then only if no change shall have occurred in the insurability of the proposed insured (and the applicant for the child's

protection benefit, if any) since the representations in Part II hereof were made and thereupon the policy shall be deemed to have taken effect as stated therein.

"2. Notice to or knowledge of the soliciting agent or the medical examiner is not notice to or knowledge of the company and neither of them is authorized to accept risks or to pass upon insurability. Only an executive officer of the company at its home office can make, modify or discharge contracts or waive any of the company's rights or requirements.

"3. The applicant's acceptance of any policy issued on this application shall constitute ratification of all representations and agreements made in writing as part of this application and of any amendments and corrections which the company makes and refers to under item 27 above in connection with issuance of the policy."

On or about April 1, 1951, during an operational flight off the coast of Japan, Captain Wadsworth's military plane was seen to go out of control. On June 29, 1951, plaintiff was advised that Captain Wadsworth's missing status had been terminated and he was officially determined to have been killed on April 1, 1951.

When the application reached the home office in New York City the insurance company issued an ordinary life policy with an aviation clause added with amendment form for Captain Wadsworth to sign. When the policy, as amended, reached Detroit on or about January 24, 1951, Captain Wadsworth had already returned to Japan. The agent, Frank Crum, did not receive Captain Wadsworth's correct address until on or about March 27, 1951, when he wrote him and sent him the amended form to sign. It is apparent that this letter never reached Captain Wadsworth, owing to his death on or about April 1, 1951.

There is competent evidence in the record to show that Captain Wadsworth knew when he signed the application for insurance that there were some additional papers that he had to sign in order to complete his application. Agent Crum testified:

"*Q.* Since she (Mrs. Wadsworth) knew all about the insurance did you explain to her what it was that you wanted to get from Captain Wadsworth when you requested his address?

"*A.* That had been explained when the case was sold.

"*Q.* I am not asking you that.

"*The Court:* Now you opened the door for it.

"*A.* She was to let me know, or I was to contact her. Captain Wadsworth was to send us his correct APO number because he knew that he had this form to sign, and that is why I contacted her several times.

"*Q.* Then it is your testimony that Captain Wadsworth knew all along that there were some papers that he had to sign in order to complete his application?

"*A.* That is correct.

"*Q.* And that you had likewise informed Mrs. Wadsworth of that fact?

"*A.* She was there at the same time.

"*Q.* And she knew then from the onset there was a form that had to be signed?

"*A.* Correct."

It also appears that when the New York office mailed the policy to its agent in Detroit, it had the amendment attached to it. Agent Crum testified:

"When I received this policy from the New York Life Insurance Company on the 24th of January, it was in the ordinary form. Of course, it had the amendment added to the printed pages of the policy. It had a number on it and it had certain changes from the policy for which the application had originally been made. This was in the form of the amendment. I did not destroy that policy. I did not instruct the

New York office of the Company to destroy the policy. As to whether I issued any instructions about its destruction, I would not have any authority to do that. I do not know who destroyed the policy."

It cannot be said that the delay in getting the amended form to Captain Wadsworth was the fault of the insurance company. The application was signed January 4, 1951; Captain Wadsworth on January 11, 1951, began his return to Japan; on January 24, 1951, the amended policy was returned to Detroit; from January 24, 1951, to February 1, 1951, the agent called Mrs. Wadsworth several times to get the address of Captain Wadsworth; on February 10, 1951, the agent wrote Captain Wadsworth for his correct mailing address and notified him that he had a form for him to sign. Captain Wadsworth replied to this letter on March 25, 1951, giving his new address as "A.P.O. 994 c/o P.M. San Francisco, Cal."

Plaintiff began an action in the circuit court of Wayne county to recover on the policy claimed to have been issued. Defendant filed an answer in which it denied that it issued an ordinary life insurance policy without aviation conditions to Captain Wadsworth. Defendant urged that a policy of insurance containing conditions relating to aviation was offered to Captain Wadsworth, but that said policy was never accepted by him. The cause came on for trial and at the close of plaintiff's proofs defendant moved for a directed verdict. The trial court granted the motion and plaintiff appeals. In her appeal she urges that the proofs establish the acceptance of the application for an ordinary life insurance policy as a matter of law.

The facts clearly establish that Captain Wadsworth applied for a policy of ordinary life insurance and the company in a counterproposal issued a policy with aviation conditions. It also appears that at the

time the present action was instituted the policy had been lost or destroyed. It is established law that agent Crum was not authorized to make binding promises that would vary the terms of the application signed by Captain Wadsworth. See *Kilburn* v. *Union Marine & General Insurance Co.*, 326 Mich 115.

Plaintiff also urges that acceptance of the application may be implied from retention of the premiums and failure to reject within a reasonable time. It should be noted that when defendant company received the premiums it did not accept or reject them by any writings but made a counterproposal with an aviation clause attached which was not accepted for reasons heretofore shown. Under these circumstances it cannot be said that the temporary retention of the premiums was an acceptance of the application. See *Smiley* v. *Prudential Insurance Company of America,* 321 Mich 60.

Plaintiff also urges that defendant company is bound by its representations that it would immediately give insurance protection upon payment of the first premium in advance. We note that the application signed by Captain Wadsworth specifically states that his insurance would date back to the application date only if and when the company approved of his application. We find no merit in this claim.

In *Olson* v. *American Central States Life Insurance Co.*, 172 Minn 511, 514, 515 (216 NW 225), cited with approval in *Smiley* v. *Prudential Ins. Co.*, 321 Mich 60, 68, 69, it was said:

" 'It is well settled that an application for life insurance is a mere proposal and like any other offer does not become a contract until accepted. * * *. But plaintiff argues that unless the insurance began on the date of the application the premium would cover a period during which defendant did not assume the risk, and the insured would be paying for

insurance for a period when he was not insured.
* * *

" 'That the assent of both parties to the same set of terms is necessary to create a contract is axiomatic. An offer never becomes a contract until accepted. Where an application provides that the insurance shall not take effect until the approval of the application by the insurer, no contract of insurance exists prior to such approval, although the application also provides that the policy shall bear the same date as the application and that the time covered by the premium shall be measured from that date.' "

In the *Smiley Case, supra,* we held that an application for life insurance is controlled by the same principles as any other contract and that such application is a mere proposal and like any other offer does not become a contract until accepted. In the case at bar Captain Wadsworth applied for an ordinary life insurance policy. The company, as a counterproposal, issued a policy with aviation conditions. Neither the application nor the proposal was accepted, hence, no contract was entered into between the parties. It follows that the judgment of no cause of action should be affirmed, with costs.

CARR, J., concurred with SHARPE, J.

EDWARDS, J. This case involves an American tragedy. Captain Joseph W. Wadsworth, a United States air force combat pilot, flying from an air base in Japan during the Korean War, was last seen over the ocean with his jet plane out of control. He was subsequently declared dead. He left behind him a wife and 2 small daughters. On his last leave, Captain Wadsworth had signed an application for $10,000 worth of life insurance with defendant New York Life Insurance Company. He had passed the

medical examination and paid an initial premium presumably to give effect to a so-called "binder clause." Following Captain Wadsworth's death, the defendant company denied payment and the beneficiary, the Captain's widow, herein brings suit in assumpsit.

We are confronted here by a truncated record, several difficult legal problems and a number of unresolved issues of fact.

The case comes to us on appeal by plaintiff-appellant from a jury verdict directed against her by the trial judge at the close of plaintiff's proofs. In such a situation we examine the record to see whether there was competent evidence from which the jury could have found for the plaintiff. *Carver* v. *Detroit & Saline Plank Road Co.,* 61 Mich 584; *Curry* v. *Traver-Bird Co.,* 167 Mich 17; *Randolph* v. *Detroit United Railway,* 213 Mich 100.

In addition to those facts cited by my Brother in his opinion, the record discloses the following:

During the course of the Korean War, a Detroit agent for the defendant company, a Mr. Frank Crum, followed the practice of soliciting insurance at the Selfridge Air Force base. This was a United States air force base which was training and housing combat pilots for active duty in the Korean War. In the course of such business activity, the general agent met Captain Joseph W. Wadsworth.

Captain Wadsworth was a pilot who looked upon air force flying as his profession. He had already flown combat missions in Korea. He had returned to the States accompanying the body of his brother— another combat pilot. He (and the agent) both knew that he was returning immediately to active combat duty.

Captain Wadsworth had a wife and 2 small daughters with whom, after his brother's funeral, he was spending his brief leave.

On New York Life's solicitation, Captain Wadsworth applied for a $10,000 life insurance policy. Mrs. Wadsworth was named as the beneficiary. The plan of life insurance described in said application (plaintiff's exhibit 1 in this proceeding) was "ordinary life;" the amount $10,000. Section 18 of the application provided:

> "Write policy to take effect
> "(a) as of last date of parts 1 and 2 of this
> application ................. (   )"

(a) was checked.

The application itself was dated January 4, 1951, and part 2 of the application, "Answers to the Medical Examiner" (plaintiff's exhibit 3), was dated January 7, 1951. In paragraphs 13 and 14 of the application, the captain described himself as "in service," and under paragraph 24 of the application he answered "yes" to a question pertaining to intent to fly in any other kind of aircraft than regularly scheduled air lines, thereby requiring the filling out of "New York Life Insurance Company military, naval and aviation blank" (plaintiff's exhibit 2), in which the captain described himself as "Capt. in USAF, Senior Pilot," with "2,902 hours" flight experience.

At the bottom of the application, above Captain Wadsworth's signature and the soliciting agent's witnessing signature, was the following:

"If the applicant shall have paid the soliciting agent in cash, as indicated in item 25 above, an amount which equals the full first premium for the policy applied for, and if the company shall receive evidence satisfactory to it that at the time of completion of this application the proposed insured (and the applicant for the child's protection benefit, if any) was an acceptable risk for said policy at the company's published premium rate therefor, the policy as applied for shall be deemed to be in effect as from the date specified in item 18 above as if it

had been delivered. Except as provided in the preceding sentence said policy shall not go into force unless and until it is delivered to the applicant and the first premium thereon paid in full during the lifetime of the proposed insured and then only if no change shall have occurred in the insurability of the proposed insured."

The same section likewise contained the following:

"Notice to or knowledge of the soliciting agent or the medical examiner is not notice to or knowledge of the company and neither of them is authorized to accept risks or to pass upon insurability. Only an executive officer of the company at its home office can make, modify or discharge contracts or waive any of the company's rights or requirements."

The application also indicated that the first premium in the sum of $68.20 was paid to the agent on January 4, 1951.

The balance of the facts relevant to this case may be shown, in time sequence, as follows:

January 4—Application for insurance made out and $68.20, first quarterly premium, paid.

January 7—Captain Wadsworth passed medical examination. Subsequently the application was sent to defendant's home office in New York.

January 11—Captain Wadsworth left Detroit to return to active duty in Korea, and subsequently was assigned, upon request, to jet piloting.

January 24—Mr. Crum, defendant's agent in the Detroit office who had secured the original application, received a policy from the home office. The policy was in the ordinary form, but he testified that it required that Captain Wadsworth sign an additional form.

Mr. Crum then called Mrs. Wadsworth to find out the Captain's address, but she had none later than APO 970 which was on the application.

February 1—Mr. Crum testified he called Mrs. Wadsworth several times between January 24th and

the first of February at which time he received a new address—APO 710.

February 10—Mr. Crum wrote Captain Wadsworth at APO 710 telling him he was writing to find out if he had the correct address and, if so, requesting an early reply because he had a form for the Captain to sign.

March 25—Captain Wadsworth replied to Crum's letter of February 10th indicating that it had been delayed over a month. The Captain's new address—APO 994—was forwarded to Crum.

March 27—Crum, having secured APO 994 from Mrs. Wadsworth before the Captain's letter arrived, wrote to the Captain sending the form and asking that he sign and return it at once.

April 1—Captain Wadsworth was reported missing after his plane entered a cloud, out of control and never reappeared.

June 29—Captain Wadsworth was declared dead as a result of the April 1st occurrence.

July 12—Mrs. Wadsworth received a letter from the Detroit office and a check for $68.20 representing the original payment on the applied-for policy. This check has not been cashed.

During all of the events related above, defendant had been receiving monthly premium payments by allotment through the United States air force of $22.90. Subsequent to the declaration of death referred to, defendant returned 4 such payments to the United States air force for return to Mrs. Wadsworth.

Subsequent to the declaration of death also, defendant destroyed the life insurance policy which it concedes it had issued on Captain Wadsworth's life. No explanation is contained in this record as to such destruction other than the agent's speculation that it was due to the fact that Captain Wadsworth obviously could not accept delivery of the policy.

In Mr. Crum's testimony it is stated that the company issued and sent to him, their general agent, the life insurance policy in question, that it contained an amendment which is totally undescribed upon this record, and that a form accompanied the policy which had to be signed by Captain Wadsworth. This form, it appears, had finally been sent to Captain Wadsworth, according to Mr. Crum's testimony, mailed on March 27th in Detroit, a matter of several days before Captain Wadsworth's plane was seen out of control over Japan.

Justice SHARPE's opinion, sustaining the trial judge, is based largely upon the following statement contained therein: "The company as a counterproposal issued a policy with aviation conditions." Such an assertion is contained in defendant's answer—denied by plaintiff's reply. There is not, however, a line of evidence in this record, as it stands now, that "aviation conditions" were ever attached to the policy issued in response to Captain Wadsworth's application, nor ever transmitted or attempted to be transmitted to Captain Wadsworth. My Brother has simply recited as a fact the affirmative defense offered by defendant and denied by plaintiff and up to the time of the directed verdict completely unproven.

We cannot, of course, presume what defendant's proofs might be. We consider this record as it stood at the close of plaintiff's proofs when the trial judge directed the verdict.

Our first question is: Did plaintiff's proofs constitute prima facie evidence of a contract?

As the record stands, it appears to us that there was a plain question of fact for jury determination: Had the insurance contract in question been accepted by the defendant company within the term of the binder clauses prior to the captain's death?

It is obvious that under the clauses set forth above, actual delivery of the policy was not required. The most that could be read into them was a requirement that the company "receive evidence satisfactory to it that at the time of completion of this application the proposed insured was an acceptable risk for said policy."

The record, of course, contains the testimony of the general agent indicating issuance of the policy but with an amendment which required the applicant to sign a form. Nothing pertaining to the nature of the amendment or the form is shown. We are urged to hold that this testimony indicates undisputed rejection and counteroffer.

On this point we find (1) testimony as to application and successfully-passed physical examination; (2) a clause which called for writing the policy to take effect as of the date of the latter event; (3) payment of the initial premium with the application, and receipt and retention of it and 4 subsequent monthly premiums by the defendant until after Captain Wadsworth was declared dead; (4) actual issuance of a policy; (5) no notice to deceased of either rejection or amendment of the policy for approximately 3 months prior to his death in spite of full knowledge of the captain's circumstances; (6) unexplained destruction of the policy by the defendant company.

In the absence of direct proofs, the jury may draw reasonable inferences from the established facts and circumstances. *Burroughs* v. *Ploof,* 73 Mich 607; *Fox* v. *Spring Lake Iron Co.,* 89 Mich 387 (16 Am Neg Cas 31); *Woods* v. *Chalmers Motor Co.,* 207 Mich 556 (19 NCCA 932); *Gapske* v. *Hatch,* 347 Mich 648; *Kaminski* v. *Grand Trunk Western R. Co.,* 347 Mich 417.

From the above facts we believe the jury could by reasonable inference have found acceptance of the risk by the company and, hence, a valid contract.

It may be urged upon us that no sensible insurance company would undertake to issue an ordinary life policy on a combat pilot in active duty in wartime and that we should take judicial notice of this fact in spite of lack of testimony on this point in this record. If so, at that point the question arises as to what the defendant company was seeking to sell Captain Wadsworth when they had him sign an application for an ordinary life policy without military or aviation waiver and with the language "write policy to take effect as of last date of parts 1 and 2 of this application." Are we to presume that, knowing the captain's military and family status, defendant's agent deliberately had him apply for and pay the first premium on protection which was known not to be available? We are not inclined to indulge a presumption so dishonorable in its intent toward a soldier on active duty in wartime. The establishment of defendant's rules and policies pertaining to acceptance of war and aviation risks must be accomplished by competent evidence during trial.

What has been said requires that the judgment of the trial court be set aside and the cause remanded for new trial.

Two other questions are, however, raised by appellant:

"2. Did plaintiff's proofs establish prima facie acceptance of the application for an ordinary life policy as a matter of law?

"3. Was defendant bound by its representations that it would immediately give insurance protection to Captain Wadsworth upon payment of the first premium in advance?"

Neither of these can we deal with conclusively, since on retrial the factual picture may be quite dif-

ferent than that currently presented. We do feel impelled to make some comment on both issues, since they will be again before the trial court.

Appellant contends in her second issue that a contract arose as a matter of law through defendant's unreasonable delay in acceptance or rejection of the application filed by the deceased.

It is certainly the general rule that mere silence or inaction on the part of an insurance company does not constitute assent to an application. *Insurance Co.* v. *Young's Administrator,* 90 US (23 Wall) 85 (23 L ed 152); *Equitable Life Assurance Society* v. *McElroy* (CCA), 83 F 631; *Bradley* v. *Federal Life Insurance Co.,* 295 Ill 381 (129 NE 171, 15 ALR 1021); Annotation, 75 ALR 952.

We are not, however, prepared to say that there may not be circumstances which can give rise to an exception to the rule stated in the case law cited above.

In general contract law, under circumstances which impose a duty to speak or act, the silence and inaction of an offeree can give rise to a contract by operation of law.

American Law Institute, 1 Restatement, Contracts, § 72, says as follows:

"(2) Where the offeree exercises dominion over things which are offered to him, such exercise of dominion in the absence of other circumstances showing a contrary intention is an acceptance. If circumstances indicate that the exercise of dominion is tortious the offeror may at his option treat it as an acceptance, though the offeree manifests an intention not to accept."

12 Am Jur, Contracts, § 40, p 535, says:

"There is a legal acceptance where silence is accompanied by acts of the offeree, such as exercise of dominion over things offered to him, which warrant an inference of assent."

Michigan, it appears, is among the minority of States in holding that there is a duty on the part of the insurance company to act with reasonable promptness. In *Robinson* v. *United States Benevolent Society,* 132 Mich 695, 699 (102 Am St Rep 436), this Court stated:

"In insurance contracts of this character it is the duty of the company to act with reasonable promptness. Failing to reject within reasonable time, the law implies an acceptance."

See, also, 39 Mich L Rev 484.

We do not know what other facts may be shown on retrial but where, as currently shown in the record before us, substantial delay in accepting or rejecting is coupled with retention of the first and succeeding premiums, the question of whether or not there was such unreasonable delay on the part of the defendant or its agent as to imply acceptance would be a question of fact for the jury. *Robinson* v. *United States Benevolent Society, supra; Rorick* v. *State Mutual Rodded Fire Insurance Co.,* 263 Mich 169; *American Life Insurance Co. of Alabama* v. *Hutcheson* (CCA), 109 F2d 424; *Preferred Accident Insurance Co.* v. *Stone,* 61 Kan 48 (58 P 986); 1 Couch, Cyclopedia of Insurance Law, § 86; Annotation: Rights and remedies arising out of delay in passing upon application for insurance, 32 ALR2d 487.

As to the third issue raised by appellant pertaining to the effect of the so-called "binder" clauses, we do not feel that *Smiley* v. *Prudential Insurance Co.,* 321 Mich 60, is controlling. As between the language of section 18 of the application in our present case and the printed paragraphs at the bottom of the application there appears to be a distinct ambiguity:

"18 Write policy to take effect
  "(a)  as of last date of parts 1 and 2
      of this application . . . . . . . . . . . . . . . . . . . . (x)
  "(b)  as of date policy is written . . . . . . . . . ( )
  "(c)  as of . . . . . . . . . . . . . . . . . . . . 19. . . . . . . . . .

"It is mutually agreed that:

"1. If the applicant shall have paid the soliciting agent in cash, as indicated in item 25 above, an amount which equals the full first premium for the policy applied for, and if the company shall receive evidence satisfactory to it that at the time of completion of this application the proposed insured (and the applicant for the child's protection benefit, if any) was an acceptable risk for said policy at the company's published premium rate therefor, the policy as applied for shall be deemed to be in effect as from the date specified in item 18 above as if it had been delivered."

The language of section 18 appears to indicate to any normal reader that the policy will be effective as of the date of part 2—whereas the subsequent clause is in definite conflict. No such ambiguity may be found in *Smiley, supra.*

Construing 2 conflicting insurance application clauses very similar to our present ones, Judge Learned Hand had the following to say which appears directly in point:

"An underwriter might so understand the phrase, when read in its context, but the application was not to be submitted to underwriters; it was to go to persons utterly unacquainted with the niceties of life insurance, who would read it colloquially. It is the understanding of such persons that counts; and not one in a hundred would suppose that he would be covered, not 'as of the date of completion of part B,' as the defendant promised, but only as of the date of approval. Had that been what the defendant meant, certainly it was easy to say so; and had it in addition meant to make the policy retroactive for some

purposes, certainly it was easy to say that too. To demand that persons wholly unfamiliar with insurance shall spell all this out in the very teeth of the language used, is unpardonable. It does indeed some violence to the words not to make actual 'approval' always a condition, and to substitute a prospective approval, however inevitable, when the insured has died before approval. But it does greater violence to make the insurance 'in force' only from the date of 'approval;' for the ordinary applicant who has paid his first premium and has successfully passed his physical examination, would not by the remotest chance understand the clause as leaving him uncovered until the insurer at its leisure approved the risk; he would assume that he was getting immediate coverage for his money. This is confirmed by the alternatives presented in the twelfth question; the insurance was to be 'effective,' either when the policy issued, or at the 'date of part B'; there was not an inkling of any other date for the inception of the risk." *Gaunt* v. *John Hancock Mutual Life Insurance Co.* (CCA), 160 F2d 599, 601, 602.

See, also, *New York Life Insurance Co.* v. *Abromietes,* 254 Mich 622; *Liberty National Life Insurance Co., Inc.,* v. *Hamilton* (CCA), 237 F2d 235; 63 Yale Law Journal 523, "Life Insurance Receipts: The Mystery of the Non-binding Binder."

We believe the instant provisions were similarly ambiguous and that competent oral testimony should have been admitted as to the circumstances surrounding the taking of the application and the expressed understanding of the parties on the question of the effective date of this policy. Where equivocal words are used in a contract, parol evidence is admissible to aid in arriving at the intention of the parties. *Borden* v. *Fletcher's Estate,* 131 Mich 220; *Brown* v. *A. F. Bartlett & Co.,* 201 Mich 268; *Weber* v. *Cole,* 323 Mich 485; 9 Wigmore, Evidence (3d ed), §§ 2465,

2472.   On retrial, it may well appear that the question of effective date of this policy should likewise be submitted to the jury for its determination.

Reviewing the record of this case, we can think of few circumstances in life where the unvarnished truth and prompt decision were more clearly called for than in the solicitation and processing of Captain Wadsworth's application for life insurance. Sympathy for his widow should not occasion court imposition of a life insurance contract which is not justified by the actions of the parties themselves. But neither should judicial recoil from sentiment occasion our forgetting that Michigan law imposes on life insurance companies twin duties of use of language which is clear and understandable to laymen *(New York Life Insurance Co.* v. *Modzelewski,* 267 Mich 293), and reasonable promptness in acceptance or rejection of the risk when such decision is reserved *(Robinson* v. *United States Benevolent Society, supra).*

For the reasons stated, the judgment of the trial court is vacated and the case remanded for new trial. Costs of this appeal will abide the ultimate result.

DETHMERS, C. J., and SMITH, KELLY, and BLACK, JJ., concurred with EDWARDS, J.

VOELKER, J., took no part in the decision of this case.